IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | |
|---|---|
| JACQUELINE ROZIER and HIRAM MORGAN,<br><br>    Plaintiffs,<br><br>    -v-<br><br>HOUSTON COUNTY BOARD OF ELECTIONS and ANDREW BENNETT in his official capacity as Chair of the Houston County Board of Elections,<br><br>    Defendants. | Civil Action No.:<br><br>**COMPLAINT FOR DECLARATORY and INJUNCTIVE RELIEF** |

## INTRODUCTION

1.  The at-large election method for the Houston County Board of Commissioners, the governing body of Houston County, Georgia, denies Black residents an equal opportunity to participate in the political process and elect candidates of choice in violation of Section 2 of the Voting Rights Act of 1965. 52 U.S.C. § 10301.

2.  Black residents comprise over 30% of Houston County's total voting-age population and are geographically concentrated in the northern and eastern sections of Warner Robins, the County's largest city. Yet despite voting cohesively for political candidates, Black voters have repeatedly failed to elect their preferred candidates to the Houston County Board of Commissioners.

3.  White residents comprise approximately 55% of Houston County's total voting-age population and have consistently voted as a bloc in at-large elections to defeat candidates for the Houston County Board of Commissioners supported by Black voters.

4.  This white bloc voting against Black-preferred candidates has prevented Black candidates preferred by Black voters from being elected to the Houston County Board of

Commissioners, including in elections held in 2022, 2016, and 2000. Consequently, no Black candidate has won election to the Houston County Board of Commissioners since 1988.

5. Moreover, the long history of discrimination against Black residents in Houston County and its continuing socioeconomic impacts further divides the County's white and Black communities and diminishes opportunities for Black voters to participate in the political process.

6. Based on the totality of circumstances, Black voters have less opportunity to participate in the political process and elect candidates of their choice, in violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.

7. Plaintiffs, Black voters living in Warner Robins, seek an injunction preventing Defendants from conducting at-large elections for the Houston County Board of Commissioners, and an order requiring Defendants to utilize an election method that does not impermissibly dilute Black voting strength.

## JURISDICTION AND VENUE

8. This Court has jurisdiction to hear this case pursuant to 28 U.S.C. §§ 1331; 1343, 42 U.S.C. § 1983, and 52 U.S.C. § 10308(f).

9. This Court also has jurisdiction under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and Rules 57 and 65 of the Federal Rules of Civil Procedure to grant the declaratory and injunctive relief requested. Upon prevailing, Plaintiff would further be entitled to fees and costs pursuant to 42 U.S.C. § 1988.

10. Venue is proper in this District pursuant to 28 U.S.C. §§ 90(b)(2) and 1391(b) because a substantial part of the events giving rise to the claims occurred in Houston County, within the Macon Division of the Middle District of Georgia.

## PARTIES

11. Plaintiff Jacqueline Rozier is a Black resident of Houston County, Georgia. Her current home is just north of Warner Robins. She is a longtime resident of Houston County. She is a registered voter.

12. Plaintiff Hiram Morgan is a Black resident of Houston County, Georgia. He currently resides on the north side of Warner Robins. He has lived in Houston County since 1974. He is a registered voter.

13. Defendant Houston County Board of Elections is responsible for administering elections in Houston County, including elections for the Board of Commissioners. O.C.G.A. §§ 21-2-40; 21-2-70.

14. Defendant Andrew Bennett is the chair of the Houston County Board of Elections. He is sued in his official capacity.

## STATEMENT OF FACTS

**Houston County Background and Demographics**

15. Houston County ("Houston" or the "County") is in Central Georgia, south of Macon. There are several cities in Houston including Warner Robins and Centerville (on the north and northwest side of the County, respectively) and Perry (in the southwest).

16. According to the census, Houston's population has grown significantly over the last two decades, from 110,765 residents in 2000 to 163,633 in 2020.

17. The census also demonstrates that Houston's population has diversified since 2000, with the County's Black population growing at a faster rate than its white population.

18. In 2000, the population of Houston County was 68.8% white and 25.3% Black.[1] By 2020, only 52.7% of the County's population was white, while the Black population had grown to 34.5%. For the County's voting-age population ("VAP"), the population above the age of eighteen, 55.7% was white in 2020 and 32.4% was Black.

19. Warner Robins is the largest city in Houston County. In 2020, half of the County—80,308 total residents—lived in Warner Robins.

20. The Black population of Houston County is concentrated in and around Warner Robins. In 2020, 63.1% of the County's Black population lived within the city limits of Warner Robins, while just 38.8% of the County's white population lived within the city.

21. Within Warner Robins itself, Black residents are further concentrated on the northern and eastern sides of the city, including in the areas bordering Robins Air Force Base.

**Elections for the Houston County Board of Commissioners**

22. The Houston County Board of Commissioners (the "Board") is the governing authority of Houston County. It has jurisdiction to enact ordinances, regulations, rules and policies on a variety of issues, including, among others, "for the support of the poor of the county, for the county police and patrol, [and] for the promotion of health" as well as for "establishing and abolishing roads and bridges." O.C.G.A. § 36-5-22.1(a); Houston Cnty. Related Laws art. I, §§ 1.1, 1.7, and 1.9.

23. The Houston County Board of Commissioners has five members. All five are elected "at-large," meaning by voters of the entire county rather than a particular area or district within the county. Houston Cnty. Related Laws art. I, § 1.2.

---

[1] The census figures included here reflect the total population reported as non-Hispanic white and any part Black. Throughout this document, any report of the white or Black population based on data from the decennial U.S. Census will be of the non-Hispanic white and any part Black populations.

4

24. Members are elected to serve four-year terms in a particular position or "Post" on the Board, designated Posts 1 through 5. Houston Cnty. Related Laws art. I, §§ 1.2.

25. Elections for the Houston County Board of Commissioners are staggered. *Id.* at 1.2. Regular elections for Posts 1 and 2 occurred in 2014, 2018, and 2022, and will next occur in 2026. Regular elections for Posts 3, 4, and 5 occurred in 2016, 2020, 2024 and will next occur in 2028.

26. General elections for Board positions are held in November and are preceded by partisan primary elections in May. O.C.G.A. § 21-2-2(15); 21-2-9(a). When no candidate receives a majority of the vote in either a general or primary election, run-offs between the top two vote getters are held four weeks later. O.C.G.A. § 21-2-501(a).

**Single-Member District Plans**

27. The Black population of Houston County is sufficiently numerous and geographically compact to constitute a majority of the voting-age population and citizen voting-age population in a single-member district of a four-district or five-district County Commission plan drawn using traditional redistricting principles.

28. Under either a four or five single-member district plan, a reasonably configured majority-Black district may be crafted—centered on the northern and eastern portions of Warner Robins—in which Black voters would have the opportunity to elect their preferred candidates.

29. Plaintiff Jacqueline Rozier resides at an address that can be included within a reasonably configured majority-Black district under either a four or five single-member district plan.

30. Plaintiff Hiram Morgan resides at an address that can be included within a reasonably configured majority-Black district under either a four or five single-member district plan.

**Racially Polarized Voting in Houston County**

31. Currently, all five elected members of the Houston County Board of Commissioners are white.

32. Since 1980, only one Black candidate has won a seat on the Board of Commissioners: Houston Porter Jr.

33. Upon information and belief, Houston Porter Jr. won elections to serve as a County Commissioner in 1980, 1984, and 1988.

34. Upon information and belief, since 1988, Black candidates have run in and lost elections for seats on the County Board of Commissioners in 1992, 1994, 2002, 2016, 2020, and 2022.

35. Black candidates have run as Democrats, as Republicans, and in nonpartisan special elections, but have consistently lost.

36. The at-large method for electing Houston County Commissioners has impermissibly diluted the voting strength of the Black community in Houston County.

37. Black voters in Houston County tend to vote similarly and exhibit substantial cohesion in voters' candidate preferences. In elections since 2016, including for the County Commission, the majority of Houston's Black voters have voted together in support of a particular candidate. When a Black candidate ran against a white candidate, the majority of Black voters regularly supported the Black candidate.

38. White voters in Houston County tend to vote cohesively against Black-preferred candidates. In elections since 2016, including for the County Commission, white voters voted as a bloc against candidates preferred by Black voters and consistently defeated those candidates.

White bloc voting regularly defeated Black candidates supported by the majority of Black voters in Houston County.

39. The County's demographics, its racially polarized voting, and its at-large method for electing Commissioners, has resulted in Black voters being unable to elect candidates they prefer to the County Board of Commissioners.

40. The totality of the circumstances in this case confirms that Black voters in Houston County have less opportunity than white voters to participate in the political process and elect candidates of their choice.

**History of Discrimination in Houston County**

41. There is a long history of official and organized discrimination against the Black residents of Houston County.

42. Beginning in the nineteenth century and stretching well into the twentieth, the state of Georgia imposed draconian laws that rigidly segregated communities across the state and relegated Black communities to second-class status. Upon information and belief, officials in Houston County implemented these laws on their Black constituents in nearly every aspect of daily life.

43. For instance, the schools in Houston County were segregated throughout the Jim Crow era. In 1970, a Court ordered the Houston County Board of Education to make active efforts to desegregate its schools. Even then, there was a fierce, organized resistance to desegregation within the white community. This resistance resulted in the establishment of a segregation academy that provided white families a path to avoid enrolling their children in integrated schools.

44. Black residents also experienced segregated housing in the County. When Robins Air Force Base was built in the 1940s, a segregated community, Jody Town, was also established

as a residence for Black civilian employees. Black residents were able to build a thriving community in Jody Town. However, as part of an urban renewal effort in the 1970s, the neighborhood was demolished and the residents relocated.

45. Black residents in Houston County were also the targets of racial violence. In the 1890s, groups of white residents engaged in "whitecapping," a practice of raids targeting Black residents with the intention of keeping them in an inferior social and economic position. And research compiled by the Equal Justice Initiative shows that there were at least four lynchings in the County between 1877 and 1950.

46. Black residents in Houston County were largely disenfranchised during the Jim Crow era. The State of Georgia had enacted a system of voting that prevented most Black residents across the state, as well as in Houston County, from accessing the ballot box, including laws that imposed poll taxes, literacy tests, and all-white primary elections.

47. While the legal regime imposed during the Jim Crow era was dismantled during the late twentieth century, prejudice has not disappeared from Houston County. Indeed, a series of recent incidents demonstrates that Black citizens of Houston County continue to face antagonism. For instance, in early 2024, a group of white high school students were filmed imitating the Ku Klux Klan in a widely publicized incident. Later that same year, the school district resolved two complaints of racial harassment made with the U.S. Department of Education's Office for Civil Rights involving allegations that a cheerleading coach employed by the district had created a racially hostile environment for two Black students.

**Socioeconomic Impacts of Discrimination**

48. The long and devastating history of discrimination against the Black residents of Houston County has contributed to significant ongoing racial disparities in critical aspects of daily

life, including access to quality education, homeownership, health outcomes, income, and employment.

49. These socioeconomic disparities demonstrate not only that Black residents of Houston County continue to shoulder burdens foisted upon them by the past, but also that there are stark divisions between Black and white communities in Houston County.

50. Black students are the largest demographic group in Houston County's public schools (over 41% of the student population). Black student experiences within the school system are different from their white peers in important ways. Black students are significantly less likely than their white peers to participate in the district's academic enrichment programs (i.e., the gifted and talented program, or AP classes). Likewise, Black students are far more likely than their white peers to be excluded from school for disciplinary reasons.

51. In housing, Black residents of Houston County are less likely to own their homes and far more likely to be renters, as compared to white residents. According to five-year estimates from the 2023 American Community Survey[2], about 50% of Black householders owned their home while the other half were renters. Among white householders three in every four owned their homes, while less than 25% rented.

52. Black and white residents of Houston County also experience significant differences in health outcomes, especially with respect to infants and children. There is a high incidence of low-birth weight, of infant mortality, and of child mortality within the Black community of Houston County. In each case, Black residents are about twice as likely to experience these negative outcomes as compared to white residents.

---

[2] For American Community Survey data reported here and in the paragraphs below, white refers to "non-Hispanic white," while Black refers to "Black, alone," including both Hispanic and non-Hispanic Black residents and householders of Houston County.

53. Black residents of Houston County are more likely than white residents to experience poverty and its consequences. According to five-year estimates compiled in the 2023 American Community Survey, 13.4% of Black residents live below the poverty level. Among white residents, 5.7% live below the poverty level. Black households in Houston County were also more likely than white households to receive food stamps. A separate estimate compiled by the University of Wisconsin Population Health Institute suggested that in 2025, 15% of Black children in Houston County lived below the poverty line, compared to 5% of white children.

54. There are also significant racial disparities in employment rates within the County, according to the five-year estimates from the 2023 American Community Survey. That survey estimated that Black residents were over twice as likely to be unemployed as white residents.

55. These disparities reinforce differences between Black and white communities in Houston County and contribute to polarization.

**Voting Practices that Enhance the Opportunity for Discrimination**

56. The election system for the Houston County Board of Commissioners includes features widely recognized as diluting Black voters' opportunities. Most significantly, experts and courts have repeatedly found that at-large election methods in jurisdictions where Black voters constitute a minority of the voting-age population serve to defeat the preferences of Black voters. Similarly, staggered terms and runoff elections are additional methods that often frustrate Black voters' preferences.

57. Houston County's long history of discrimination, the persistence of prejudice against Black residents, the significant socioeconomic disparities that divide communities by race, and the County's election methods that often frustrate minority voters, all contribute to diminishing Black voters' opportunities to participate in the political process in Houston County.

## CAUSE OF ACTION

**Count I: Violation of Section 2 of the Voting Rights Act (52 U.S.C. § 10301); 42 U.S.C. § 1983**

58. Plaintiffs incorporate by reference all the preceding paragraphs as if fully set forth herein.

59. Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301(a), prohibits any "State or political subdivision" from imposing a "standard, practice, or procedure . . . which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color."

60. Violations of Section 2 occur when the "political processes . . . are not equally open to participation" to protected classes of voters, in that members of the protected class "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b).

61. Election methods impermissibly dilute the voting strength of a protected community if they deprive members of that community of an equal opportunity to elect representatives of their choice.

62. *Thornburg v. Gingles*, 478 U.S. 30 (1986) provides the necessary preconditions for establishing a claim of impermissible vote dilution under Section 2. Specifically, successful claims must show that (1) a minority group is sufficiently large and geographically compact to constitute a majority in a single member district; (2) the minority group is politically cohesive; and (3) the majority group votes sufficiently as a bloc to enable it to usually defeat the minority's preferred candidate.

63. In addition, Section 2 requires a showing that, under the "totality of the circumstances" members of the protected minority community have less opportunity than other

members of the electorate to participate in the political process. 52 U.S.C. § 10301(b). Several factors enumerated in a Senate Report on the 1982 amendments to the Voting Rights Act may be relevant to this showing including: (1) the history of official voting-related discrimination in the state or political subdivision; (2) the extent to which voting in the elections of the state or political subdivision is racially polarized; (3) the extent to which the state or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group; (4) the exclusion of members of the minority group from candidate slating processes; (5) the extent to which members of the minority group bear the effects of discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process; (6) the use of overt or subtle racial appeals in political campaigns; (7) the extent to which members of the minority group have been elected to public office in the jurisdiction; (8) the extent to which elected officials exhibit a lack of responsiveness towards members of the minority population; and (9) the extent to which the policy underlying the political subdivision's use of the challenged standard, practice, or procedure is tenuous.

64. The current at-large method for electing members to the Houston County Board of Commissioners denies and abridges the Plaintiffs' right to vote on account of their race. Considering the totality of circumstances, the at-large method impermissibly dilutes the voting strength of the Black community in Houston County as it results in Black voters having less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. As a result, the at-large election method violates Section 2 of the Voting Rights Act.

**PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs respectfully request that the Court:

(1)   Declare that the current at-large election method used to elect members to the Houston County Board of Elections violates Section 2 of the Voting Rights Act, 52 U.S.C. § 10301;

(2)   Permanently enjoin Defendants from administering any elections for the County Board of Commissioners under the at-large method of election;

(3)   Order Defendants to administer elections for the Houston County Board of Commissioners using a method of election that complies with Section 2 of the Voting Rights Act;

(4)   Award Plaintiffs the costs of this action together with their reasonable attorneys' fees and expenses under 52 U.S.C. § 10310(e) and 42 U.S.C. § 1988;

(5)   Retain jurisdiction to render any and all further orders that this Court may deem appropriate; and

(6)   Grant such additional relief as the interests of justice may require.

Date: October 30, 2025

Respectfully submitted,

_/s/ Jack Genberg_

Bradley E. Heard (GA Bar No. 342209)
Jack Genberg (GA Bar No. 144076)
Ajay Saini*
1101 17th St. NW, Suite 550
Washington, DC 20036
SOUTHERN POVERTY LAW CENTER
(470) 708-0554
bradley.heard@splcenter.org
jack.genberg@splcenter.org
ajay.saini@splcenter.org

*Pro hac vice motion forthcoming

**Attorneys for Plaintiffs**