## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## MACON DIVISION

| | |
|---|---|
| JACQUELINE ROZIER, *et al.*, <br><br> Plaintiffs, <br><br><br> -v- <br><br><br> HOUSTON COUNTY BOARD OF ELECTIONS, *et al.*, <br> Defendants. | Civil Action No.: 5:25-cv-00478 |

**RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO STAY OR DISMISS**

Plaintiffs Jacqueline Rozier and Hiram Morgan ("Plaintiffs") brought this lawsuit against the Houston County Board of Elections and its Chair, Andrew Bennett ("Defendants"), challenging Houston County's at-large method for electing County Commissioners under Section 2 of the Voting Rights Act of 1965, 52 U.S.C. 10301, and 42 U.S.C. § 1983. This case is related to *Driver v. Houston Co. Bd. of Elec.*, 5:25-cv-00025-MTT (M.D. Ga.), which raises similar facts and legal questions, and is currently in active discovery. Plaintiffs have moved to consolidate the two cases, and that motion remains pending.

Defendants now move to stay this litigation, based on speculation about potential Supreme Court actions during the current term that might alter Voting Rights Act doctrine. However, conjecture about future court actions that may, or may not, bear on this case cannot justify a stay. Moreover, Defendants seek to stay only this case, while allowing *Driver* to

proceed. Consequently, their request will not conserve resources, but it will significantly prejudice the Plaintiffs by excluding them from ongoing discovery and case development.

Defendants also move to dismiss Plaintiffs' complaint, arguing that Section 2 lacks a private right of action and cannot be enforced through § 1983. This Court rejected these arguments in *Driver* just three months ago, concluding that the text and history of the Voting Rights Act, as well as 50 years of precedent, clearly established that Section 2 was privately enforceable. Order, *Driver*, Doc. 41 (Sept. 2, 2025). Since Defendants offer no basis to revisit that ruling, this Court should reject their arguments again.

## I.    The Court should not stay this case

District courts possess inherent authority to manage their dockets, including "broad discretion to stay proceedings." *Clinton v. Jones*, 520 U.S. 681, 706 (1997). That power, however, "must not be exercised lightly." *Home Ins. Co. v. Coastal Lumber Co.*, 575 F. Supp. 1081, 1083 (N.D. Ga. 1983). When determining whether to stay a case, a court must weigh "the interests of all the parties and the interests of the court in an orderly disposition of its caseload." *Id.* In doing so, courts "consider the possible damage, hardship, and inequities" that granting or denying a stay would impose on either party. *Schreiber v. Key*, 2024 WL 4278270, at *1 (M.D. Ga. Sept. 24, 2024) (quoting *Choat v. Rome Indus., Inc.*, 480 F. Supp. 387, 391 (N.D. Ga. 1979)). If there is even a "fair possibility" that a stay will cause harm to the non-movant, then the stay can only be appropriate with "a clear case of hardship or inequity" to the movant. *Landis v. No. American Co.*, 299 U.S. 248, 256 (1936).

Under this standard, the balance decisively weighs against a stay here. Defendants identify no hardship from proceeding; the prejudice to the Plaintiffs from being sidelined while

parallel litigation moves forward is substantial; and the proposed reason for delaying this case rests on speculation about future Supreme Court decisions.

### A. Defendants will not suffer hardship or inequity if this case proceeds

Defendants cannot show that they will suffer "hardship or inequity in being required to go forward" with this case. *Id.* The Defendants are already proceeding with full discovery and litigation on similar factual and legal issues in *Driver*, and they have not sought a stay there.

As Plaintiffs explained in their motion to consolidate, this case and *Driver* both challenge Houston County's at-large method of electing County Commissioners under Section 2 of the Voting Rights Act of 1965. Doc. 11-1 at 2. The two cases name the same defendants, involve similar core factual records, and will require overlapping expert analyses. Discovery in *Driver* is underway and will continue through March 2026. Doc. 14 at 5. That discovery will require Defendants to collect, review, and produce documents; sit for, defend and take depositions; work with experts; and fully litigate the underlying issues of the *Driver* Plaintiffs' Section 2 claim.

Since Defendants are already engaged in these tasks in *Driver*, they cannot credibly claim that proceeding in this case imposes hardship on them. Instead, staying this case would only serve to selectively prevent the Plaintiffs in this case from participating in the development of a record that will likely shape the resolution of both cases. *See Landis*, 299 U.S. at 255 ("Only in rare circumstances will a litigant in one cause be compelled to stand aside while a litigant in another settles the rule of law that will define the rights of both.").

### B. Plaintiffs will suffer significant prejudice if this case is stayed

While the burden on the Defendants of proceeding in this case is minimal, the prejudice to the Plaintiffs of staying the litigation is substantial. If, as Defendants request, this case is stayed until June 2026, the *Driver* litigation will have completed discovery, addressed dispositive

motions, and possibly proceeded through trial and remedial proceedings.[1] While this case is stayed, Plaintiffs may not serve their own discovery, participate in deposition scheduling, question witnesses, or exchange expert reports. By the time the stay is lifted, depositions will already have been taken, documents will already have been produced, and experts will have already formed opinions based on a record Plaintiffs had no opportunity to help shape. That lost opportunity cannot be recreated.

This exclusion would be especially prejudicial in a redistricting case where remedies include drawing single-member districts. Plaintiffs reside in the northern portion of Warner Robins, and they have an interest in how the community they live in is ultimately drawn into remedial districts. The *Driver* Plaintiffs have no obligation to advance remedial configurations that protect the Plaintiffs' interests here. A remedial plan could readily emerge that fully satisfies the *Driver* Plaintiffs, but fractures or submerges the communities in which the Plaintiffs in this case live. Without participation in discovery or expert analysis, Plaintiffs could be disadvantaged in their effort to ensure that any proposed remedy accounts for their representational interests.

Additionally, staying this case creates serious fact-dependence problems that lock Rozier Plaintiffs into a record non-reflective of their concerns. As a practical matter, the factual record of the *Driver* litigation will act de facto on issues involving the Houston County election system. It would be unrealistic to expect the Court, or the parties, to re-open and re-litigate those issues in a second, stayed and revived case. In short, Defendants ask the Court to compel the Plaintiffs in this case to "stand aside while a litigant in another [case] settles the rule of law that will define

---

[1] This timing is consistent with the *Driver* Plaintiffs' stated objective of obtaining relief in advance of the November 2026 general election. Doc. 15 at 4.

the rights of both," precisely what *Landis* says should occur only in the rarest of circumstances. 299 U.S. at 255.

**C. Defendants fail to adequately justify their request for a stay**

Apart from balancing the interests, the Court should also reject Defendants' request because they fail to provide an adequate justification for staying this case. *See Clinton*, 520 U.S. at 708 ("The proponent of a stay bears the burden of establishing its need."). Defendants assert that a stay is necessary here because of the possibility that the Supreme Court may alter Voting Rights Act doctrine in *Louisiana v. Callais*, No. 24-109. Doc. 17-1 at 3-4.[2] Speculation that the Supreme Court may, at some point, issue a decision that could overrule decades of precedent in some yet-to-be determined fashion cannot justify delaying litigation.

Courts must apply governing law as it currently exists, unless and until the Supreme Court explicitly overrules it. *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989); *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 136 (2023); *Agostini v. Felton*, 521 U.S. 203, 237 (1997). A grant of certiorari does not overrule existing precedent, and it should not be read as changing the law. *In re Bradford*, 830 F.3d 1273, 1275 (11th Cir. 2016); *Thompson v. United States*, 924 F.3d 1153, 1156 n.4 (11th Cir. 2019).

Thus, this Court must apply existing precedent in this case, including *Allen v. Milligan*, 599 U.S. 1 (2023), which reaffirmed the use of the *Gingles* factors in evaluating Section 2 claims just two years ago, unless and until the Supreme Court expressly says otherwise. Staying this

---

[2] Defendants also argue that a stay is warranted because the Supreme Court has discussed *Turtle Mountain v. Howe*, 137 F.4th 710 (8th Cir. 2025), in conference. The case for a stay pending a decision in *Turtle Mountain* is even weaker than the argument related to *Callais*. The Supreme Court has not granted certiorari in *Turtle Mountain*, meaning the Defendants ask this Court to hold Plaintiffs' case in abeyance based on speculation that the Court might eventually review a decision from another circuit.

case in anticipation of a hypothetical Supreme Court decision that might alter Voting Rights Act doctrine is inappropriate precisely because it would disregard this clear binding precedent.

While some courts have granted stays to await a forthcoming appellate decision, they have done so where the case on appeal is similar enough to the district court matter that the outcome of the appeal would likely control the resolution of issues in the district court. *See e.g.*, *Miccosukee Tribe of Indians v. S. Fla. Water Mgmt. Dist.*, 559 F.3d 1191, 1198 (11th Cir. 2009) (finding a stay appropriate where appellate ruling in a "similar" case would "likely" be "controlling" in the case before the district court). Those are not the circumstances here. *Callais* arises from a significantly different factual context: a constitutional challenge to a remedial congressional map enacted by the Louisiana legislature, which alleged race was intentionally used as a predominant factor in drawing certain district lines. In contrast, Plaintiffs challenge an at-large election system and seek relief through single-member districts that can be drawn using traditional districting principles. Plaintiffs do not contend that race must be used as a predominant factor in drawing any remedial map. Given these material differences, it is far from clear that *Callais* will address, let alone decide, the central issues that control the outcome here.

Accordingly, even if the Court finds it possible that *Callais* will eventually alter some aspect of Voting Rights Act doctrine, a stay here would be inappropriate, because it cannot determine whether any forthcoming ruling will materially affect this case. The possibility that the Supreme Court might decide issues that might bear on this litigation is far too speculative to justify halting proceedings.

## II.    The Court should deny the motion to dismiss

Defendants move to dismiss this case under Fed. R. Civ. P. 12(b)(1) and 12(b)(6). A 12(b)(1) challenge to subject matter jurisdiction may be facial or factual. *Stalley v. Orlando*

*Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1232 (11th Cir. 2008). In a facial attack, such as the one raised here, "the allegations in [the] complaint are taken as true," and the court only considers whether "the plaintiff has sufficiently alleged a basis of subject matter jurisdiction." *Id*. at 1232-33 (quoting *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990)).

Under 12(b)(6), complaints must plead "sufficient factual matter" to state a claim "that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility exists where the alleged facts allow a "reasonable inference that the defendant is liable for the misconduct alleged." *Id*. At this stage of the litigation, "all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff." *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1296 (11th Cir. 2011) (quoting *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1261 (11th Cir. 2006)).

### A.    This Court has already considered and rejected the arguments Defendants repeat here

In their motion to dismiss, Defendants largely repeat legal arguments this Court considered and rejected in *Driver*. Defendants again argue that Section 2 of the Voting Rights Act of 1965 does not provide individuals with a private right of action, and that private plaintiffs cannot enforce Section 2 through § 1983. Doc. 17-1 at 7-15, 15-20. Defendants rehash nearly all of the arguments in their brief from their prior motion, and the limited information that they add does not significantly alter the basic legal theories Defendants previously made in *Driver.*

In denying the Defendants' previous motion to dismiss, this Court ultimately found that "private plaintiffs may enforce Section 2 either through an implied private right of action, Section 1983, or both." *Driver*, Doc. 41 at 11. The Court carefully considered and rejected each of Defendants' arguments, holding that "Section 2 of the [Voting Rights Act] creates a privately

enforceable right," that "the text and structure of the [Voting Rights Act] evidence Congress's intent to create a private remedy for Section 2," and that plaintiffs can also enforce Section 2 through § 1983. *Id*. at 5, 8, 11.

Since this Court, just three months ago, thoroughly considered Defendants' arguments and squarely rejected them, and since the Defendants have not provided additional authority suggesting that the prevailing law this Court applied is no longer valid, the Court should promptly deny the Defendants' motion. Nevertheless, to ensure a complete record, Plaintiffs address Defendants' arguments below and affirm that they still have no merit.

**B.  There is an implied private right of action under Section 2 of the Voting Rights Act**

**1.   Binding precedent confirms that Section 2 is privately enforceable**

Precedent from both the Supreme Court and the Eleventh Circuit establishes that section 2 is privately enforceable. In *Morse v. Republican Party of Va.*, 517 U.S. 186, 233-234 (1996), the Supreme Court held that Section 10 of the Voting Rights Act, which prohibits the use of poll taxes, contained an implied private right of action. The Court reached that conclusion by noting that Section 2, which also lacks an express cause of action, was "clearly intended by Congress" to be privately enforceable. 517 U.S. at 232 (opinion of Stevens, J., joined by Ginsburg, J.) (quoting S. Rep. No. 97-417, at 30); *see id*. at 240 (opinion of Breyer, J., joined by O'Connor, J., and Souter, J.) (agreeing that Section 10 is enforceable because Sections 2 and 5 are privately enforceable). *Morse* thus made explicit what courts, including the Supreme Court and the Eleventh Circuit had consistently assumed for decades: that Section 2 was enforceable by private plaintiffs. *See, e.g., Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647 (2021); *Bartlett v. Strickland*, 556 U.S. 1 (2009); *LULAC v. Perry*, 548 U.S. 399 (2006); *Voinovich v. Quilter*, 507 U.S. 146 (1993); *Chisom v. Roemer*, 501 U.S. 380 (1991).

The Eleventh Circuit has repeatedly cited *Morse* in recognizing a private right of action to enforce Section 2. In *Lewis v. Governor of Alabama,* the Eleventh Circuit quoted *Morse* in holding that Congress "clearly intended" Section 2 to be privately enforceable. 896 F.3d 1282, 1293 (11th Cir. 2018), vacated on other grounds on reh'g en banc, 944 F.3d 1287 (11th Cir. 2019). Likewise, in *Ford v. Strange*, the Eleventh Circuit noted that "a majority of the Supreme Court has indicated that § 2 of the Voting Rights Act contains an implied private right of action." 580 F. App'x 701, 705, n.6 (11th Cir. 2014). And district courts within the Circuit have followed the same rule, explicitly recognizing a private right of action under Section 2. *See e.g. Georgia NAACP v. Georgia*, No. 1:21-CV-5338, 2022 WL 18780945, at *4 (N.D. Ga. Sept. 26, 2022) (three-judge court); *Georgia NAACP v. State*, 269 F. Supp. 3d 1266, 1275 (N.D. Ga. 2017) (three-judge court); *Singleton v. Allen*, 782 F. Supp. 3d 1092, 1317 (N.D. Ala. 2025) (three-judge court); *Singleton v. Merrill*, 582 F. Supp. 3d 924, 1031 (N.D. Ala. 2022) (three-judge court). The uniformity of this authority underscores what *Morse* made explicit: Section 2 is privately enforceable. Defendants identify no Eleventh Circuit authority supporting their contrary view.

Moreover, the holding in *Morse* cannot be dismissed as mere dicta. A majority of the Supreme Court agreed that the existence of a private right of action under Section 2 was integral to correctly interpreting Section 10. Because that reasoning was "necessary to [the] result," it is binding. *Seminole Tribe of Fla. V. Florida*, 517 U.S. 44, 67 (1996). Even if the Court accepts that the discussion of Section 2 in *Morse* is dicta, this Court is "obligated to respect" that guidance. *Henderson v. McMurray*, 987 F.3d 997, 1006 (11th Cir. 2021); *Schwab v. Crosby*, 451 F.3d 1308, 1325 (11th Cir. 2006) ("there is dicta, and then there is dicta, and then there is Supreme Court dicta."). Either way, *Morse* confirms that Section 2 is privately enforceable.

2.    **The text and history of the Voting Rights Act confirms that Section 2 is privately enforceable**

Aside from the overwhelming precedent on this issue, the text and history of the Voting Rights Act demonstrate that Congress intended Section 2 to be privately enforceable. When a statute does not contain an express private right of action, "the dispositive question is whether one is implied." *Singleton*, 782 F. Supp. 3d at 1317 (citing *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001)). A statute has an implied right of action when it confers both a private right and a private remedy. *Id*. Section 2 does both.

a.    **Section 2 confers a private right**

To determine whether a statute confers a private right, courts ask "whether Congress *intended to create a federal right*." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 274 (2002) (emphasis in original). A statute confers a private right where it is "phrased in terms of the persons benefitted and contains rights-creating, individual centric language with an unmistakable focus on the benefitted class." *Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 183, (2023) (internal quotation marks omitted) (quoting *Gonzaga*, 536 U.S. at 284, 287, 122 S.Ct. 2268. Section 2 displays an "unmistakable focus" on individuals like the Plaintiffs and uses "clear and unambiguous rights-creating language." *Id*.; Medina *v. Planned Parent South Atlantic*, 606 U.S. 357, 380 (2025); *Driver*, Doc. 41 at 4-5.

First, Section 2's title "expressly concerns rights," specifically the "voting rights for members of a class protected from discrimination based on race or color." *Singleton*, 782 F. Supp. 3d at 1312. The title of Section 2 is "[d]enial or abridgement of right to vote on account of race or color through voting qualifications or prerequisites." 52 U.S.C. § 10301. "This framing is

indicative of an individual 'rights-creating focus.'" *Tavelski*, 599 U.S. at 184 (quoting *Gonzaga*, 536 U.S. at 284.[3]

Next, the statutory text further confirms this focus. Subsection (a) prohibits policies and practices "*which result in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color*." 52 U.S.C. § 10301(a) (emphasis added). This language unmistakably focuses on an individual's right to exercise their franchise free from both intentional and result-based discrimination. Subsection (b) provides additional protection from unequal political processes to "*members of a class of citizens protected by subsection (a)*."  52 U.S.C. § 10301(b) (emphasis added). Thus, "every sentence of Section 2 either refers to rights of the benefited class, contains rights-creating language that creates new rights for that specific class, or expressly focuses on the benefited class." *Singleton*, 782 F. Supp. 3d at 1312.

This "unmistakable focus on the benefitted class" stands in sharp contrast to the statutes at issue in *Gonzaga* and *Sandoval. Singleton*, 782 F. Supp. 3d at 1312-1313 (quoting *Cannon v. Univ. of Chicago*, 441 U.S. 677, 691 (1979). In both cases, the Supreme Court held that the statutory provisions at issue did not focus on individuals. *Sandoval*, 532 U.S. at 288-289 (finding no private right of action to enforce Section 602 of Title VI of the Civil Rights Act because the statute "focuses neither on the individuals protected nor even on the funding recipients being regulated, but on the agencies that will do the regulating."); *Gonzaga*, 536 U.S. at 290 (holding

---

[3] Defendants argue that the reference to "right to vote" in Section 2's title does not itself confer rights. Doc. 17-1 at 19 (citing *Medina*, 606 U.S. at 384 (2025). While *Medina* confirms that a title "cannot enlarge or confer powers" standing alone, it also recognizes that "a title may underscore that the statutory text creates a right." *Id*. 606 U.S. at 384 (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 19 n. 14 (1981)). Consistent with *Medina*, the title of Section 2 reinforces, alongside the other textual evidence, that Congress intended to protect individual voting rights in Section 2. The Court previously acknowledged this very point. See *Driver*, Doc. 41 at 4-5.

there was no implied private right to enforce the Family Educational Rights and Privacy Act because its provisions "have an aggregate, not individual, focus, and they serve primarily to direct the [regulating agency's] distribution of public funds to education institutions."). Section 2, by contrast, expressly focuses on individuals. *Singleton*, 782 F. Supp. 3d at 1313. It expressly protects voters' right to cast their ballot free from discrimination, and it "serves primarily to protect citizens' rights and to prevent states from interfering with those rights." *Id*. *See* 52 U.S.C. § 10301(a)-(b).

The Defendants mistakenly argue that Section 2 does not focus on the benefited class because it references regulated entities, i.e., state and local governments. Doc. 17-1 at 17. Statutes can create private rights even when they "direct[] requirements at actors that might threaten those rights." *Tafelski*, 599 U.S. at 185. As the Supreme Court has made clear, it is not "a material diversion from the necessary focus" on benefited individuals for a statute to also "establish who it is that must respect and honor" the rights it creates. *Id*. "The Fourteenth Amendment hardly fails to secure § 1983-enforceable rights because it directs state actors not to deny equal protection." *Id*.

Defendants also argue that Section 2 does not include rights-creating language because it does not create the right to vote; rather, it merely enforces a constitutional right. *See* Doc. 17-1 at 18. This misstates the right at issue in Section 2. It is not the right to vote itself that Section 2 confers, but the right to vote *free from discrimination*. *Singleton*, 782 F. Supp. 3d at 1316. As such, it is similar to other statutes that protect individuals from discrimination where courts have found an implied right of action. *See Cannon*, 441 U.S. at 709 (finding an implied right of action under Title IX of the Education Amendments of 1972 to challenge discrimination in education programs based on sex).

The Defendants also misconstrue the concept of rights-creating language. The Court does not need to find that Section 2 created a new right found nowhere else in law to imply a right of action. *Singleton*, 782 F. Supp. 3d at 1315. Indeed, the Supreme Court has previously implied private rights of action to enforce other provisions of the Voting Rights Act that overlap with constitutional rights, including Section 10, *Morse*, 517 U.S. at 233 (holding that Section 10 "established a right to vote without paying a fee"), and Section 5, *Allen v. State Bd. of Elec.*, 393 U.S. 544. And the Eleventh Circuit implied a private right of action to enforce the materiality provision of the Voting Rights Act. *Schwier v. Cox*, 340 F.3d 1284, 1294-1297 (2003).

Accordingly, Section 2 of the Voting Rights Act creates a privately enforceable right.

### b.  The Voting Rights Act creates a private remedy

The text and structure of the Voting Rights Act demonstrate Congress's intent to provide a private remedy for Section 2 violations. In particular, the remedial provisions of Sections 3 and 14 confirm that Congress anticipated enforcement actions brought by private individuals.

Section 3 authorizes remedial oversight measures in proceedings brought by "the Attorney General or *an aggrieved person*" to "enforce the voting guarantees of the fourteenth and fifteenth amendment." 52 U.S.C. §§ 10302(a)–(c) (emphasis added). Section 14 similarly permits attorney's fees to a "prevailing party, *other than the United States*" in "any action or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment." 52 U.S.C. § 10310(e) (emphasis added). These provisions make clear that Congress expected private parties, not just the Attorney General, to bring actions to enforce federal voting rights.

Courts in this Circuit have long recognized that Section 2 falls within the category of actions enforcing the voting guarantees of the Fourteenth and Fifteenth Amendments to the United States Constitution. The Eleventh Circuit has held that the Voting Rights Act, including

Section 2, "is a constitutional exercise of congressional enforcement power under the Fourteenth and Fifteenth Amendments." *United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1550 (11th Cir. 1984). District Courts have echoed this principle. *See e.g. Georgia State Conf. of the NAACP*, 2022 WL 18780945 at *6 ("Section 2 is inevitably—at least in part—an action that enforce[s] the voting guarantees of the fourteenth or fifteenth amendment" under Sections 3 and 14); *Singleton v. Allen*, 740 F. Supp. 3d at 1159–60 (holding that Section 2 "unambiguously" enforces the Fifteenth Amendment).

Given that a Section 2 action enforces the voting guarantees of the Fourteenth and Fifteenth Amendments, it fits squarely within the "proceedings that Congress has implied, in Sections 3 and 14 . . . that private parties may assert." *Georgia State Conf. of the NAACP,* 2022 WL 18780945, at *6.

Defendants push back on this analysis, arguing that Section 3 only provides additional remedies for statutes that already contain a private cause of action, and not Section 2. Doc. 17-1 at 10-11; 52 U.S.C. § 10302. But that interpretation is incompatible with the plain text of Section 3 and the structure of the Voting Rights Act which expressly refers to actions that enforce the voting guarantees of the Fourteenth and Fifteenth Amendment, and with binding precedent treating Section 2 as a statute that enforces those guarantees. The Court should, therefore, reject Defendants' interpretation.

      c.  **The legislative history of the Voting Rights Act further confirms Congress's intent to create a private right of action**

As noted above, private plaintiffs have been filing, and Courts have been entertaining Section 2 challenges for decades. "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 239-240 (2009). Thus, while

14

Congress was well aware that courts across the country had implied a private right to enforce

Section 2 when it repeatedly amended the Voting Rights Act, it did not include in any of those

amendments an explicit limit on private plaintiffs' ability to file a Section 2 claim. *See generally,*

Pub. L. No. 91-285, 84 Stat. 314 (1970); Pub. L. No. 94-73, 89 Stat. 400 (1975); Pub. L. No. 97-

205, 96 Stat. 131 (1982); Pub. L. No. 109-246, 120 Stat. 577 (2006).

     Rather, Congress, in deliberations involving several amendments to the Voting Rights

Act, affirmed the private enforceability of Section 2. For instance, the "authoritative source for

[the] legislative intent" behind Section 2, the Senate Report to the 1982 amendment, "reiterates

the existence of the private right of action under Section 2, as has been clearly intended by

Congress since 1965," S. Rep. No. 97-417, at 30 (1982). Similarly, the House Report to the 1982

amendment states that Congress "intended that citizens have a private cause of action to enforce

their rights under Section 2." H. Rep. No. 97-227, at 32 (1981). Moreover, in 1975, Congress

justified adding an attorney fees provision to the Voting Rights Act, Section 14, by noting that

fees were "appropriate in voting rights cases because . . . Congress depends heavily upon private

citizens to enforce the fundamental rights involved," and "[f]ee awards are a necessary means of

enabling private citizens to vindicate these Federal rights." *Morse*, 517 U.S. at 234 n. 46 (citing

S. Rep. No. 94-295 at 40-41 (1975). These statements confirm the conclusion drawn from

interpreting the statutory text above: Section 2 of the Voting Rights Act is privately enforceable.

### C.  Plaintiffs Are Entitled to Sue Under Section 1983

     If a statute provides a private right, that right is "presumptively enforceable by § 1983."

*Gonzaga*, 536 U.S. at 284-85 ("Plaintiffs suing under § 1983 do not have the burden of showing

an intent to create a private remedy because § 1983 generally supplies a remedy for the

vindication of rights secured by federal statutes."). Since Section 2 provides an individual right,

as evidenced by the arguments in Section II.B.2.a, *supra*, the Defendants bear the burden of
showing that § 1983 is not available to enforce Section 2.

Defendants attempt to overcome this presumption by arguing that Congress created a
"comprehensive enforcement process" for Section 2 through the Attorney General, which is
"incompatible" with individual enforcement under § 1983. Doc. 17-1 at 19 (quoting *City of
Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 121 (2005)).  This argument fails for several
reasons. First, the case law relating to implicit preclusion "concerned statutes with self-contained
enforcement schemes that included statute-specific rights of action." *Tavelski*, 599 U.S. at 189
(citing *Rancho Palos Verdes*, 544 U.S. at 120-23). These statutes required plaintiffs to "comply
with particular procedures and/or to exhaust particular administrative remedies" before filing a
lawsuit. *Id*. (quoting *Fitzgerald v. Barnstable School Comm.*, 555 U.S. 246, 254 (2009). Under
these circumstances, allowing individual enforcement through § 1983 would have "circumvented
the statutes' pre-suit procedures." *Id*. The Voting Rights Act, by contrast, provides no express
private right of action with procedural and substantive requirements or any private administrative
remedy. Thus, enforcement through § 1983 does not "circumvent" any pre-suit procedures
designed by Congress.

Second, there is no evidence that the creation of an express enforcement mechanism
through the Attorney General is "incompatible" with individual enforcement under § 1983. In the
text of Section 12 of the Voting Rights Act, which provides for enforcement by the Attorney
General, "there is certainly no specific exclusion of private actions." *Allen*, 393 U.S. at 554-55 n.
18 (1969). "The attendant presumption is that § 1983 can play its textually prescribed role as a
vehicle for enforcing [statutorily conferred] rights, even alongside a detailed enforcement regime
that also protects those interests, so long as § 1983 is not 'incompatible' with Congress's

handiwork." *Tavelski*, 599 U.S. at 188-189 (citing *Rancho Palos Verdes*, 544 U.S. at 120; *Blessing v. Freestone*, 520 U.S. 329, 347-348 (1997)). Defendants have offered no evidence to the contrary, and so the Court should consider enforcement by the Attorney General a "non-exclusive means to vindicate voting rights." *Driver*, Doc. 41 at 10.[4]

As a result, the Plaintiffs can enforce their Section 2 claim through § 1983.

## III.    Conclusion

For the foregoing reasons, the Court should deny Defendants' motions to stay and motion to dismiss.

Date: December 5, 2025                Respectfully submitted,

*/s/ Ajay Saini*
Bradley E. Heard (GA Bar No. 342209)
Jack Genberg (GA Bar No. 144076)
Ajay Saini
1101 17th St. NW, Suite 550
Washington, DC 20036
SOUTHERN POVERTY LAW CENTER
(571) 682-0014
bradley.heard@splcenter.org
jack.genberg@splcenter.org
ajay.saini@splcenter.org

*Attorneys for Plaintiffs*

---

[4] The Eleventh Circuit has also affirmed that the provision providing for enforcement through the Attorney General does not foreclose private enforcement. *Schwier v. Cox*, 340 F.3d 1284 (11th Cir. 2003). In that case, the Eleventh Circuit evaluated the materiality clause of the Voting Rights Act, which is similar to Section 2. It found that "neither provision for enforcement by the Attorney General nor Congress's failure to provide for a private right of action expressly in [Section 12] require the conclusion that Congress did not intend such a right to exist." *Schwier*, 340 F.3d at 1295-96.